**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAMIE STROUSE, | ) | CASE NO. 4:18CV00099 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Tamie Strouse, ("Plaintiff" or "Strouse"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.   PROCEDURAL HISTORY

In October 2014, Strouse filed applications for POD, DIB, and SSI, alleging a disability onset date of September 1, 2014 and claiming she was disabled due to Lyme disease, chronic pain, concentration deficits, sleep apnea, irritable bowel syndrome, depression, anxiety, and bipolar disorder.  (Transcript ("Tr.") 10, 145, 176.)  The applications were denied initially and upon reconsideration, and Strouse requested a hearing before an administrative law judge ("ALJ").  (Tr. 10, 85-93, 95.)

On July 20, 2016, an ALJ held a hearing, during which Strouse, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-57.)  On November 23, 2016, the ALJ issued a written decision finding Strouse was not disabled.  (Tr. 10-33.)  The ALJ's decision became final on November 15, 2017, when the Appeals Council declined further review.  (Tr. 1-4.)

On January 12, 2018, Strouse filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 14.)  Strouse asserts the following assignments of error:

(1)   The ALJ failed to reasonably weigh the opinion of treating source Dr. MacNealy under the correct legal standards.

(2)   The ALJ failed to reasonably weigh the opinion of treating source Dr. Conti under the correct legal standards.

(Doc. No. 12.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Strouse was born in October 1975 and was forty (40) years-old at the time of her

administrative hearing, making her a "younger" person under social security regulations. (Tr. 25.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has at least a high school education and is able to communicate in English. (Tr. 26.) She has past relevant work as veterinary assistant. (Tr. 25.)

**B.** **Relevant Medical Evidence[2]**

On October 3, 2014, Strouse was voluntarily admitted to the hospital for treatment of "an exacerbation of depression and anxiety in the setting of chronic pain." (Tr. 548.) On admission, she presented with complaints of depressed mood, suicidal ideation, visual hallucinations, and increased difficulty with focus, concentration, and recall. (Tr. 938.) She was diagnosed on admission with mood disorder, and assessed a Global Assessment of Functioning ("GAF")[3] of 11-20, indicating "some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication." (Tr. 547-548.)

Treatment during her hospital stay included pharmacotherapy as well as individual, group and milieu psychotherapy. (Tr. 548.) Medications included Wellbutrin, Prozac, Klonopin, and Zyprexa. (*Id.*) Hospital physician Robert Jenkins, M.D., noted that Strouse's "treatment course

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Moreover, as Strouse limits her argument to the ALJ's evaluation of the opinions of mental health providers Drs. MacNealy and Conti, the Court will largely limit its discussion of the medical evidence to that relating to her mental health impairments.

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

was complicated by acute exacerbations of pain, primarily neck pain with headaches, that

prevented [her] from participation in treatment on certain days." (*Id*.) Eventually, however,

Strouse was "able to benefit greatly from psychotherapy" and "gradually displayed a brighter

mood, better sleep and appetite, more relaxed affect with greater distress tolerance, increased

energy, improved concentration, greater self-esteem, and more hopefulness about recovery." (Tr.

548-549.) On October 13, 2014, Dr. Jenkins discharged Strouse, explaining as follows:

> On 10/13/2014, Tamie Strouse appeared stable for discharge with outpatient
> follow-up. She reported a "good" mood with an appropriate and only mildly
> anxious affect, good eye contact, normal speech, no psychomotor disturbances, and
> a goal directed thought process. She denied any auditory or visual hallucinations
> and did not endorse any delusions. She denied any suicidal ideations, homicidal
> ideations, wish to die, or thoughts of harm. She reported feeling ready and able to
> leave the hospital and continue treatment through the [partial hospitalization
> program ("PHP")]. She expressed improved insight into her illness and good
> judgment about recovery, including the importance of continuing the above
> therapeutic process at PHP and later with long-term individual therapy. She also
> expressed hopefulness about improved pain management through outpatient
> follow-up with a specialist.

(Tr. 549.) She was diagnosed on discharge with major depressive disorder, recurrent episode,

severe without psychotic behavior; agoraphobia with panic attacks; and post-traumatic stress

disorder, chronic. (Tr. 548.) Strouse's GAF on discharge was 51, indicating moderate symptoms

or moderate difficulty in social, occupational, or school functioning. (*Id*.)

On October 28, 2014, Strouse presented to licensed professional counselor Margie

Werner, L.P.C., for an initial assessment. (Tr. 489-491.) She indicated she had struggled with

depression most of her life, and reported previous in-patient psychiatric hospitalizations in 2002

and 2007. (Tr. 489.) On mental status examination, Ms. Werner noted Strouse had normal

behavior; soft speech; psychomotor retardation; anxious, constricted, and irritable mood;

constricted affect; normal thought process and content; and fair insight and judgment. (Tr. 490-

491.)  Ms. Werner concluded Strouse "is a dependent individual who seems to have a difficult time meeting her own needs," noting she "was focused on somatic concerns."  (Tr. 491.)  Ms. Werner diagnosed major depression, recurrent episode, moderate, without psychotic behavior; and assessed a GAF of 51-60, indicating moderate symptoms.  (*Id*.)  She recommended treatment with "cognitive behavioral strategies to address depression and symptoms of anxiety as well as management of pain."  (*Id.*)

On December 10, 2014, Strouse was again voluntarily admitted to the hospital for psychiatric treatment.  (Tr. 1195-1214.)  On admission, she was tearful and dysphoric, stating "I wanna die. I'm scared of everything."  (Tr. 1206.)  Strouse reported her mind felt "foggy" and indicated she could only remember "bits and pieces" since her previous hospital stay.  (*Id*.)  She recalled she had attended PHP for several days but ended early, and then lost her insurance and was unable to afford outpatient treatment.  (*Id*.)  Strouse complained of anhedonia, frequent crying spells, severe anxiety, low energy, poor appetite, hopelessness, helplessness, and worthlessness.  (*Id*.)

On mental status examination, Strouse was disheveled and tearful with a depressed mood and constricted affect.  (Tr. 1209.)  Physician Gina Cavorsi, M.D., also noted good eye contact, no psychomotor retardation, normal speech, a goal-directed thought process, impulsive judgment, and poor insight.  (Tr. 1209-1210.)  Strouse was oriented to time, place, and person; her "attention/concentration, language, fund of knowledge, and immediate memory [were] intact;" but her short term memory appeared impaired.  (Tr. 1210.)  Dr. Cavorsi diagnosed major depression, recurrent episode, severe, without psychotic behavior; panic disorder without agoraphobia; and post-traumatic stress disorder, chronic; and assessed a GAF of 31-40,

indicating "some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." (*Id*.)  Strouse was admitted for individual and group therapy, and medication management. (*Id*.)

Strouse was discharged six days later, on December 16, 2014. (Tr. 1196-1198.)  During her hospital stay, she participated in therapy and was treated with Wellbutrin, Prozac, Klonopin, Gabapentin, Abilify, Roxicodone, and Soma. (Tr. 1197.)  She was again treated by Dr. Jenkins, who noted she "gradually displayed a brighter mood, better sleep and appetite, a more stable affect with greater distress tolerance, increased energy, improved concentration, and greater hopefulness about recovery." (*Id*.)  On discharge, Dr. Jenkins found as follows:

> On December 16, 2014, Tamie Strouse appeared stable for discharge with outpatient follow-up.  She reported a "pretty good" mood with an appropriate and baseline anxious affect, good eye contact, normal speech, no psychomotor disturbances, and a goal directed thought process. She denied any auditory or visual hallucinations and did not endorse any delusions. She denied any suicidal ideations, homicidal ideations, wish to die, or thoughts of harm. She reported feeling ready and safe to leave the hospital and continue treatment at PA Counseling. She expressed improved insight into her illness and good judgment about recovery, including the importance of adherence to outpatient treatment and the benefits of case management services.

(Tr. 1197-1198.)  Strouse's diagnoses on discharge were major depression, recurrent episode, severe, without psychotic behavior; panic disorder; and PTSD. (Tr. 1196.)  Her GAF was 51, indicating moderate symptoms, and her prognosis was "stable but guarded given history of nonadherence to aftercare and poor social support." (Tr. 1196-1197.)

 On January 12, 2015, Strouse presented to psychologist Melissa Conti, Psy.D., for treatment of her depression and anxiety. (Tr. 708-713.)  Dr. Conti did not record any findings on mental status examination. (Tr. 712.)  She diagnosed major depressive disorder, PTSD, generalized anxiety disorder, and history of bipolar disorder; and assessed a current GAF of 60,

6

indicating moderate symptoms.  (Tr. 713.)

Strouse returned to Dr. Conti on January 22, 2015.  (Tr. 707.)  Dr. Conti noted an anxious and depressed mood and appropriate affect.  (*Id*.)  It appears they discussed Strouse's pain and cognitive issues associated with her physical health problems, as well as her "conflicted" emotions over a failed relationship.  (*Id*.)  Dr. Conti again assessed a current GAF of 60.  (*Id*.)

On February 5, 2015, Strouse presented to Dr. Conti with a depressed mood and appropriate affect.  (Tr. 706.)  Dr. Conti noted Strouse was "tearful at times" over her break-up with her boyfriend and her medical issues.  (*Id*.)  She assessed a current GAF of 60.  (*Id*.)

On February 25, 2015, Dr. Conti completed a Medical Source Statement regarding Strouse's mental ability to do work-related activities.  (Tr. 701-705.)  Dr. Conti noted Strouse was alert and oriented with no hallucinations, an appropriate stream of thought, no suicidal ideation, average intelligence, and intact remote and recent memory.  (Tr. 704.)  She also found Strouse had impaired concentration, "some impairment" in immediate retention and recall, "somewhat impaired" social judgment, and fair insight.  (Tr. 703-704.)  Dr. Conti stated Strouse "dissociates at times" and was "somewhat impulsive."  (*Id*.)

Dr. Conti found Strouse experienced "daily panic" and identified her triggers as social situations and chronic medical issues.  (Tr. 703.)  She concluded Strouse exhibited difficulties performing daily activities on a sustained basis, explaining "she often isolates and limits daily activities due to anxiety and poor health."  (*Id*.)  She also noted Strouse had difficulties in social functioning, noting she "has a history of unhealthy relationships."  (*Id*.)  Dr. Conti found Strouse's physical and mental impairments negatively effected her ability to maintain concentration, persistence, and pace.  (*Id*.)

Based on "client report and clinical observation," Dr. Conti concluded Strouse was moderately limited in her abilities to (1) understand, remember, and carry out simple instructions; and (2) make judgments on both simple and complex work-related decisions.  (Tr. 701.)  She opined Strouse was markedly limited in her abilities to (1) understand, remember, and carry out complex instructions; (2) interact appropriately with the public, supervisors, and co-workers; and (3) respond appropriately to usual work situations and to changes in a routine work setting.  (Tr. 701-702.)  When asked to identify the factors that supported her assessment, Dr. Conti noted "client report."  (Tr. 702.)

On February 24, 2015, Strouse was again voluntarily admitted to the hospital for psychiatric treatment for depression and suicidal ideation.  (Tr. 716-730.)  On admission, she reported decreased appetite, feelings of hopelessness, poor concentration, decreased energy, decreased sleep, decreased motivation, and panic attacks.  (Tr. 725.)  Strouse also stated she had been "crying all the time" and had "no joy in anything."  (*Id.*)  On examination, psychiatrist Cynthia Fonder, M.D., noted as follows:

> She was cooperative with the exam and maintained good eye contact.  She described her mood as depressed and rated it as 10/10, with 10 indicating the highest level of severity.  Affect was sad.  She spoke at a normal volume but a slightly slow rate.  Her thought process was organized and goal directed.  She denied having current suicidal, homicidal and paranoid ideation.  She denied having auditory and visual hallucinations.  She was alert and oriented to person, place, and time.  Her insight and judgment were impaired.

(Tr. 726.)  Dr. Fonder diagnosed bipolar disorder, not otherwise specified; generalized anxiety disorder; and panic disorder with agoraphobia.  (Tr. 727.)  She assessed a GAF of 25, indicating serious impairment in communication or judgment or inability to function in almost all areas.  (Tr. 727.)  Strouse was admitted for individual and group therapy, and medication management.

8

(*Id.*)

Strouse was discharged several weeks later, on March 16, 2015.  (Tr. 716-720.)  During treatment, she reported high levels of depression and anxiety and complained of memory problems, feeling confused, and auditory hallucinations (i.e., "she reported hearing voices telling her to go find a gun.")  (Tr. 717.)  Psychological testing was ordered to assess Strouse's memory and the possibility of bipolar disorder.  (Tr. 718.)  Dr. Fonder summarized the results of this testing as follows:

> Initial results indicated that the patient's processing speed was slower than  what would  be  expected for others her age and educational level.  Problem solving abilities appeared inflexible  and perseverative.  Her memory at this time appeared to be in the average range although she  continues  to  report  lapses  in  memories that  span  from  a  few  hours  to  a  few  days  in  which  she  feels  foggy.   It  was suggested  that  consideration  should  be  given  to  the    possibility  that  her reported  memory  issues  are  secondary  to  a  clinical  syndrome  and/or personality  pattern  rather  than  a  primary  issue  with  memory.

(*Id.*)  With treatment, Strouse "slowly noted some gradual improvements in her levels of depression and anxiety."  (*Id.*)  When examined on the morning of discharge, Strouse presented with a constricted affect and euthymic mood.  (*Id.*)  She indicated her level of depression had improved and rated it a 5 on a scale of 10.  (*Id.*)  Dr. Fonder diagnosed bipolar disorder, generalized anxiety disorder, and panic disorder with agoraphobia, and assessed a GAF on discharge of 50, indicating serious symptoms.  (Tr. 716.)

Six months later, on September 21, 2015, Strouse presented to neurologist Chachua Yan, M.D., for treatment of peripheral neuropathy in her fingers and feet.  (Tr. 1222-1224.)  On neurologic examination, Dr. Yan noted Strouse was alert and oriented with no impairment of recent or remote memory, normal attention span and ability to concentrate, and an appropriate fund of knowledge.  (Tr. 1223.)  Her mood and affect were described as "not anxious."  (Tr.

9

1224.)  Strouse returned to Dr. Yan on November 24, 2015.  (Tr. 1217-1219.)  She complained of a "3 day period recently where her memory was poor, she was confused, had trouble to walk, and controlling her extremities."  (Tr. 1217.)  Dr. Yan noted that objective testing (including a CT of her head, an EMG/NCS of her lower extremities, an MRI of her brain, and an EEG) were all normal.  (Tr. 1218.)  Neurologic examination findings were the same as Strouse's previous visit, including no impairment of recent or remote memory, normal attention span and ability to concentrate, and a "not anxious" mood and affect.  (Tr. 1218-1219.)

On January 9, 2016, Strouse was again admitted to the hospital for psychiatric treatment due to worsening depression, agoraphobia, and suicidal ideation.  (Tr. 1110.)  She reported poor motivation and energy, chronic auditory hallucinations, anxiety, panic attacks, and paranoia. (*Id*.)  She was admitted with diagnoses of major depressive disorder, severe, recurrent with psychotic features; panic disorder with agoraphobia; and generalized anxiety disorder; and treated with therapy and medication.  (Tr. 1111-1112.)  Strouse was discharged on January 15, 2016.  (Tr. 1118.)  Her attending physician Anthony Smartnick, M.D., summarized her hospital course as follows:

> Remarkable for gradual and progressive resolution of underlying psychotic thought disorder.  Eventually, she stabilized her mood.  Eventually, psychotic symptoms have resolved. She was stable in her mood. Thoughts of suicide have resolved. She was able to fully convincingly contract for safety outside the hospital. She was discharged on 01/15/2016. She was discharged in stable condition.

(*Id*.)

On March 7, 2016, Strouse began treatment with neurologist and psychiatrist Mark MacNealy, D.O., J.D.  (Tr. 1240-1244.)  On mental status examination, Dr. MacNealy noted a well groomed appearance, average eye contact, average activity, average demeanor, clear speech,

10

no reported delusions or hallucinations, logical thought process, above average intelligence, and depressed mood.  (Tr. 1241-1242.)  He assessed post-traumatic stress disorder and prescribed several medications, including Klonopin, Brintellix, Ambien, Wellbutrin, Abilify, and Minipress. (Tr. 1242-1243.)

Strouse returned to Dr. MacNealy on April 6, 2016.  (Tr. 1238-1239.)  He noted she was "responding slowly to medication."  (Tr. 1238.)  On examination, Dr. MacNealy noted slowed activity, clear speech, "mildly slowed [thought process] consistent with lack of thyroid," logical thought content with no delusions, depressed and anxious mood, no suicidal ideation, cooperative behavior, and good insight and judgment.  (*Id*.)  He adjusted Strouse's medications.  (Tr. 1239.)

On July 19, 2016, Dr. MacNealy completed a questionnaire regarding Strouse's mental impairments.  (Tr. 1234-1237.)  He offered a diagnosis of PTSD, chronic; and identified the following signs and symptoms of Strouse's impairment: (1) poor memory, (2) sleep disturbance, (3) emotional lability, (4) loss of intellectual ability of > 15 IQ points, (5) recurrent panic attacks, (6) anhedonia or pervasive loss of interest, (7) psychomotor agitation or retardation, (8) feelings of guilt/worthlessness, (9) social withdrawal or isolation, (10) decreased energy, (11) intrusive recollections of a traumatic experience, (12) persistent irrational fears, (13) generalized persistent anxiety, (14) difficulty thinking or concentrating, (15) suicidal ideation or attempts, (16) hostility and irritability, (17) pathological dependence or passivity.  (*Id*.)  Dr. MacNealy also noted bad dreams and nocturnal diaphoresis.  (Tr. 1235.)  He explained that Strouse's PTSD "is reflected by her daily reaction to environmental [illegible] and the persistent fear of sleep (rather typical for such cases)."  (*Id*.)  Dr. MacNealy found Strouse's psychiatric condition exacerbated her experience of pain or other symptoms, and concluded her prognosis was poor.  (*Id.*)

11

With regard to Strouse's functional limitations, Dr. MacNealy opined she was markedly[4] limited in the following categories:

- Deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner;

- Episodes of deterioration or decompensation in work;

- The ability to remember locations and work-like procedures;

- The ability to sustain an ordinary routine without special supervision;

- The ability to make simple work-related decisions;

- The ability to ask simple questions or request assistance;

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;

- The ability to respond appropriately to changes in the work setting;

- The ability to be aware of normal hazards and take appropriate precautions;

- The ability to travel in unfamiliar places or use public transportation.

(Tr. 1236-1237.)  He found Strouse had extreme limitations in the following categories:

- Restrictions of activities of daily living;

- Difficulties in maintaining social functioning;

- The ability to understand, remember, and carry out very short and simple instructions;

- The ability to understand, remember, and carry out detailed instructions;

---

[4] The questionnaire defined the term "marked" as follows: "Marked means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively."  (Tr. 1237.)

- The ability to maintain attention and concentration for extended periods;

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- The ability to work in coordination with proximity to others without being distracted by them;

- The ability to complete a normal workday & work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- The ability to interact appropriately with the general public;

- The ability to accept instructions and respond appropriately to criticism from supervisors;

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- The ability to set realistic goals or make plans independently of others.

(*Id.*)  In the narrative section of the questionnaire, Dr. MacNealy explained as follows:

"[Strouse's] PTSD has lasted twenty years.  She has continued to re-experience/relive past traumatic events. Thus, making treatment difficult if not impossible.  I've encouraged [Strouse] to not give up hope and in that regard have provided cutting edge technology @ no charge to this patient."  (Tr. 1237.)  He further stated that Strouse "is unable to work [because she] stays in her bedroom all day to avoid environmental stimulants/triggers." (Tr. 1236.)

**C.     State Agency Reports**

**1.      Mental Impairments**

On April 27, 2015, state agency psychologist Roger Fretz, Ph.D., reviewed Strouse's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 63-66.)  In the PRT, Dr. Fretz found Strouse had

13

mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and "one or two" repeated episodes of decompensation, each of extended duration. (Tr. 63.)

In the Mental RFC, Dr. Fretz found Strouse was moderately limited in her abilities to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; and (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 65-66.) Dr. Fretz explained as follows:

> The claimant is capable of self-care /hygiene. She is able to perform [activities of daily living], although may have some compromise secondary to chronic pain concerns. She has had intermittent treatment[;] has recently been hospitalized secondary to exacerbation of depression and suicidal ideation. GAF at point of discharge noted to be 50 (moderate). There is no evidence of a thought disorder, no evidence of severe dysfunction in any area. She described some social withdrawal, able to interact appropriately with treatment providers, no legal issues indicated. She described some difficulty with concentration, may need reminders. She would be able to understand and complete simple instructions. * * * The claimant's allegations are deemed to be partially credible. The claimant would be able to perform simple tasks.

(Tr. 66.)

### 2. Physical Impairments

On March 4, 2015, state agency physician Robert Balogh, Jr., M.D., reviewed Strouse's medical records and completed a Case Analysis. (Tr. 62-63.) Dr. Balogh determined Strouse's physical impairments were non-severe. (*Id.*)

### D. Hearing Testimony

During the July 20, 2016 hearing, Strouse testified to the following:

- She graduated from high school. (Tr. 39.) She is "kind of homeless," and is living part of the time with her brother-in law and part of the time with her

14

boyfriend. (Tr. 38, 40.) She has four children, ages 19, 16, 11, and 10. (Tr. 39-40.) They live with their father, but were staying with her at the time of the hearing. (*Id.*)

- She has a driver's license but does not have a car and does not remember the last time she drove. (Tr. 39.) She has previous work experience as a veterinary technician. (Tr. 40.) She stopped working in 2014 due to complications from Lyme disease. (Tr. 41.) Specifically, she could not concentrate or remember things, and she experienced numbness in her hands. (*Id.*)

- She suffers from several physical health problems, including migraines, neuropathy in her hands and feet, and irritable bowel syndrome. (Tr. 41-42.) She gets migraines approximately four times per week. (Tr. 48.) Her migraines last about four hours, and are accompanied by nausea, vomiting, and sensitivity to light and noise. (*Id.*) Her neuropathy is mainly in her fingers and toes. (Tr. 48-49.) As a result of this condition, she has difficulty holding on to things and experiences "stabbing pain" in her feet. (*Id.*) She used a cane "for awhile" due to her neuropathy and degenerative discs in her back. (*Id.*) Her IBS causes stomach pain and necessitates frequent trips to the bathroom. (Tr. 51.) She has an implant in her bladder to help with this condition, but she still needs to urinate every hour. (*Id.*) She takes various medications for her physical impairments. (Tr. 41-42.)

- She also suffers from depression, anxiety, and PTSD. (Tr. 41.) She has been psychiatrically hospitalized on several occasions. (Tr. 44.) She currently sees a psychiatrist, Dr. MacNealy. (Tr. 43.) Dr. MacNealy prescribes medication and has also performed neuromodulation, in which they "shocked her brain" every day for two weeks for twenty minutes. (Tr. 44.) It did not help relieve her symptoms. (*Id.*)

- She described her depression as follows: "I'm just kind of sad. I really have no purpose. . . . I don't really want to do anything. I don't really have any joy in doing anything." (Tr. 50.) She experiences panic attacks approximately four times per week. (Tr. 49.) Her PTSD is triggered by certain memories and noises. (Tr. 50-51.) It causes panic attacks with chest pain, tightness, and pain. (*Id.*)

- She can dress and bathe herself. (Tr. 47.) On a typical day, she does not do anything and stays in her bedroom. (Tr. 45-48.) She does not cook or prepare meals and usually just eats rice. (*Id.*) She has not done any chores for the past 8 to 9 months. (*Id.*) She does not belong to any clubs or organizations, and does not go to church. (Tr. 46.) She never goes to the store alone and does not take public transportation. (*Id.*) Sometimes she will go to the store with her boyfriend, and occasionally she takes her kids to the drive thru. (Tr. 47.) She

15

> watches her sons play video games, and reads on the computer.  (Tr. 46-47.)  She
> often has to re-read things more than once in order to understand them.  (Tr. 47-
> 48.)

The VE testified Strouse had past work as a veterinary assistant (medium, semi-skilled,

SVP 4).  (Tr. 10, 52.)  The ALJ then posed the following hypothetical question:

> Please assume an individual with the same age, education and work experience as
> the Claimant who would be limited to lifting and carrying up to 50 pounds
> occasionally and 25 pounds frequently, postural activities would be limited to
> frequently, such as climbing stairs, ramps, balancing, stooping, kneeling, crouching
> or crawling, no climbing ladders, ropes, scaffolds, no exposure to hazards such as
> dangerous machinery or working at unprotected heights, no detailed or complex
> instructions, simple, repetitive tasks, low stress work, and that would be no strict
> production quotas or fast paced and only routine work, with few changes in the work
> setting and only occasional contact with co-workers, supervisors, and the public.

(Tr. 52-53.)

The VE testified the hypothetical individual would not be able to perform Strouse's past

work as a veterinary technician but would be able to perform representative jobs in the economy,

such as (1) machine packager (medium, unskilled); (2) laundry worker I (medium, unskilled); (3)

floor technician (medium, unskilled); (4) labeler (light, unskilled); (5) laundry press operator

(light, unskilled); and (6) production line solderer (light, unskilled).  (Tr. 53-54.)

The ALJ then asked a series of hypothetical questions, as follows:

> Q:    Now, what if, if we were looking at light jobs lifting and carrying up to 20,
>       ten, 20 pounds occasionally, ten pounds frequently and only occasional
>       postural activities, such as climbing stairs, ramps, balancing, stooping,
>       kneeling, crouching, crawling.  Would that change the light jobs that you
>       cited, either numbers or types of jobs?
>
> A:    It would not.
>
> Q:    What if I had a restriction that the individual, in order to go the restroom,
>       would not have to be replaced by an individual such as a receptionist could
>       not get up to walk about until someone came and sat and his or her spot.
>       Would that change anything?

16

A:    No, it would not.

Q:    What if the individual would be off task ten percent of the work day, beyond normal breaks?

A:    It would be my opinion that if the Claimant or a hypothetical worker were off task up to ten percent of the time, they would not be able to perform any of the jobs that I've identified and could not do really any unskilled work at any exertional level.  And, this is primarily due to the fact that unskilled work is so production oriented and employers have strong expectations that they need to be on task performing work activity a minimum of 90 percent of the time.

(Tr. 54.)  Finally, the ALJ asked "if I had a specific restriction of indoor work to avoid bright sunlight, would that change anything?"  (Tr. 56.)  The VE testified this additional restriction would not effect the previously identified jobs.  (*Id*.)

Strouse's counsel asked "if the hypothetical employee were to miss two or more days a month, would that . . be work preclusive?"  (*Id*.)  The VE testified that two or more absences per month would be work preclusive "on a long-term basis." (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;

17

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Strouse was insured on her alleged disability onset date, September 1, 2014, and

remains insured through June 30, 2017, her date last insured ("DLI.")  (Tr. 10.)  Therefore, in order to be entitled to POD and DIB, Strouse must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since September 1, 2014, the alleged onset date (20 CFR 404.1571, et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: affective and anxiety disorders and migraines (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), subject to the following limitations: (1) lifting and carrying 50 pounds occasionally and 25 pounds frequently; (2) frequent postural activities, such as climbing stairs and/or ramps, balancing, stooping, kneeling, crouching, and crawling; (3) no climbing of ladders, ropes, or scaffolds; (4) no exposure to hazards, such as dangerous machinery or unprotected heights; (5) no detailed or complex instructions; (6) limited to simple, repetitive tasks that are considered low stress work, defined as no strict production quotas or fast pace with only routine work with few changes in the work setting; and (7) occasional contact with coworkers, supervisors, and the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

19

7.        The claimant was born on October ** 1975 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.        The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.        Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can peform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-27.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physicians MacNealy and Conti*

Strouse argues the ALJ erred in discounting the opinions of her treating physicians, Drs. MacNealy and Conti.  (Doc. Nos. 12, 14.)  She first maintains the ALJ improperly supplanted her own "lay interpretation" of these physicians' observations, thereby "assuming the role of medical expert,  . . . a role she lacks the training and expertise to fill."  (Doc. No. 12 at 7, 9.)  Strouse then asserts the ALJ failed to consider these physicians' opinions in the broader context of the record as a whole and, instead, relied only upon "limited portions of the record" which supported her rejection of these physicians' assessments.  (*Id.* at 7.)  In this regard, Strouse emphasizes medical evidence showing she has been psychiatrically hospitalized on a number of different occasions, sometimes for extended periods of time.  (*Id.*)  She argues that "the fact that Plaintiff required this treatment reasonably indicates or is at least not inconsistent with the presence of marked impairment."  (Doc. No. 14 at 4.)

The Commissioner argues the ALJ properly evaluated the opinions of Drs. MacNealy

and Conti.[5]  (Doc. No. 13.)  With regard to Dr. MacNealy, she maintains the ALJ properly

discounted his opinion of marked and extreme limitations because it "was not supported as there

were only two reports of Dr. MacNealy's in the record, neither of which contained much more

than a showing that Plaintiff had a depressed mood but she had otherwise normal cognitive

functioning."  (*Id*. at 14.)  The Commissioner asserts the ALJ recognized the fact Strouse had

repeated psychiatric hospitalizations but properly found her symptoms improved quickly with

appropriate treatment.  (*Id*. at 16.)  With regard to Dr. Conti, the Commissioner asserts "it is not

clear that her opinion should be classified as [a treating physician opinion] as Dr. Conti saw

Plaintiff on only three occasions."  (*Id*. at 19.)  Regardless, the Commissioner argues the ALJ

properly rejected Dr. Conti's opinion because her treatment notes "provide no real reports of

substantial symptoms for Plaintiff and her assessed GAF scores for Plaintiff were between 60 to

65 which indicate only mild to some moderate impairment." (*Id*. at 20.)  Finally, the

Commissioner argues the ALJ properly rejected both physicians' opinions on the grounds they

were based on Strouse's subjective reports and inconsistent with their own treatment notes.

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of*

---

[5] The Commissioner also engages in a lengthy argument regarding the ALJ's RFC and
credibility findings, both with regard to Strouse's physical and mental impairments.  The
only issues raised in this matter, however,  relate to the ALJ's rejection of the opinions of
Strouse's treating mental health physicians, Drs. MacNealy and Conti.  (Doc. No. 14 at
1.)  As Strouse correctly notes, the question of whether the ALJ articulated good reasons
for rejecting these opinions is separate and distinct from the question of whether the
ALJ's RFC and credibility findings regarding Strouse's physical impairments are
supported by substantial evidence.  Thus, the Court need not address the Commissioner's
arguments regarding the ALJ's evaluation of Strouse's various physical impairments.

*Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6]  However, "a finding

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

the case record means only that the opinion is not entitled to 'controlling weight,' not that the

opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009)

(quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[7]  Indeed, "[t]reating source

medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[8]  *See also Gayheart*,

710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling

weight, then the opinion is weighed based on the length, frequency, nature, and extent of the

treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to

which the opinion is consistent with the record as a whole and is supported by relevant evidence,

*id*. § 404.1527(c)(2)-(6).")

　　　　If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

---

[6] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[8] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*,

710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear

explanation "'let[s] claimants understand the disposition of their cases,' particularly where a

claimant knows that his physician has deemed him disabled and therefore 'might be bewildered

when told by an administrative bureaucracy that she is not, unless some reason for the agency's

decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.

2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and

permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at

544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not

accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of*

*Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383,

391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner

makes the determination whether a claimant meets the statutory definition of disability.  This

necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The Court addresses the ALJ's evaluation of the opinions of Dr. MacNealy and Dr. Conti separately, below.

### *Dr. MacNealy*

As noted *supra*, on July 19, 2016, Dr. MacNealy opined Strouse had numerous marked and extreme mental functional limitations. (Tr. 1234-1237.) Specifically, he found Strouse was markedly limited in the following ten areas: (1) deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; (2) episodes of deterioration or decompensation in work; (3) the ability to remember locations and work-like procedures; (4) the ability to sustain an ordinary routine without special supervision; (5) the ability to make simple work-related decisions; (6) the ability to ask simple questions or request assistance; (7) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (8) the ability to respond appropriately to changes in the work setting; (9) the ability to be aware of normal hazards and take appropriate precautions; and (10) the ability to travel in unfamiliar places or use public transportation. (*Id*.) Dr. MacNealy concluded Strouse had extreme limitations in the following twelve areas: (1) restrictions of activities of daily living; (2) difficulties in maintaining social functioning; (3) the ability to understand, remember, and carry

out very short and simple instructions; (4) the ability to understand, remember, and carry out

detailed instructions; (5) the ability to maintain attention and concentration for extended periods;

(6) the ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; (7) the ability to work in coordination with proximity to

others without being distracted by them; (8) the ability to complete a normal workday & work

week without interruptions from psychologically based symptoms and to perform at a consistent

pace without an unreasonable number and length of rest periods; (9) the ability to interact

appropriately with the general public; (10) the ability to accept instructions and respond

appropriately to criticism from supervisors; (11) the ability to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes; and (12) the ability to set realistic

goals or make plans independently of others.  (*Id.*)

   The ALJ accorded "minimal weight" to Dr. MacNealy's opinion, explaining as follows:

> Dr MacNealy, the claimant's treating psychiatrist since February of 2016, completed a Mental RFC Assessment dated July 19, 2016 (Exhibit 20-F).  He indicated that the claimant suffered from multiple and numerous psychiatric symptoms, including emotional lability, loss of intellectual ability of more than 15 points, recurrent panic attacks, psychomotor agitation or retardation, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience,  persistent irrational fears, generalized persistent anxiety, difficulty thinking or concentrating, hostility and irritability, suicidal attempts, pathological dependence or passivity, bad dreams, and nocturnal diaphoresis.   As a result of those reported symptoms, Dr. MacNealy indicated that the claimant's prognosis was poor and that, as a result of her symptoms, she exhibited marked to extreme impairment in all work-related  mental activities.
>
> Dr MacNealy's treatment records, however, are not consistent with that rather grave and dire assessment (Exhibit 21-F). Dr MacNealy submitted his assessment in July of 2016, but the record documents only two office visits, on March 7, and April 6, 2016 (Exhibit 21-F).  The initial mental status examination on March 7, 2016, noted only some depressed  mood, which was characterized as normal (Exhibit 21-F at 5).  There were no other mental status abnormalities.  On April 6, 2016, Dr MacNealy reported that the claimant was responding slowly to

medication and noted only that she exhibited a depressed and anxious mood.  He reported that her thought process was "mildly slowed consistent with a lack of thyroid."  However, all other mental status findings were within normal limits as set forth above.  Those minimal findings are not, in any way, consistent with the rather dire assessment he submitted, and are inconsistent with the marked and extreme functional limitations contained therein.  The symptoms set forth in the assessment do not appear in his clinical notes and, therefore, can be based only on an unquestioned acceptance of the claimant's subjective statements.  For example, he noted daily panic attacks in his assessment, but no such allegation is noted in his records, let alone objective observations, nor are other drastic symptoms reported, such as withdrawal,  psychomotor agitation, persistent and irrational fears, poor memory, hostility and irritability, or pathological dependence.  It is reasonable to assume that a clinician would document the presence of such severe symptoms and complaints in his office records if they were exhibited during treatment sessions.  Dr MacNealy's records contain no such allegations or clinical observations.    Thus, it appears that he simply parroted back the claimant's complaints when completing this assessment, and those statements are not consistent with his own treatment records.    Accordingly, Dr MacNealy's assessment is not based on clinical observations, but on the subjective complaints of the claimant alone.  Therefore, his opinion is not entitled to controlling, deferential, or significant weight and is entitled to minimal weight beyond the reporting diagnosis of PTSD.

(Tr. 23-24.)

The Court finds the ALJ articulated "good reasons" for rejecting Dr. MacNealy's opinion.  The ALJ rejected Dr. MacNealy's "rather grave and dire" assessment for the principal reason that it was inconsistent with his own treatment records.  This reason is supported by substantial evidence.  As noted *supra*, Strouse presented to Dr. MacNealy on two occasions, March 7, 2016 and April 6, 2016.[9]  (Tr. 1240-1244, 1238-1239.)  Aside from depressed and

_____

[9] Although the ALJ recognized Dr. MacNealy as a "treating physician," the Court has some doubt as to whether he qualifies as such for purposes of social security regulations. A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition.  20 C.F.R. §§ 404.1502 and 416.902.  *See Reeves v. Comm'r of Soc. Sec*., 618 Fed. Appx. 267, 273 (6th Cir. July 13, 2015).  Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec*., 167 Fed. Appx. 496,  506–07 (6th

anxious mood, mental status examination findings on both visits were largely normal.

Specifically, on March 7, 2016, Dr. Mac Nealy noted a well groomed appearance, average eye

contact, average activity, average demeanor, clear speech, no reported delusions or

hallucinations, logical thought process, above average intelligence, and depressed mood.  (Tr.

1241-1242.)  On April 6, 2016, he found clear speech, logical thought content with no delusions,

no suicidal ideation, cooperative behavior, good insight and judgment, "mildly slowed [thought

process] consistent with lack of thyroid," and depressed and anxious mood.  (Tr. 1238.)

Moreover, although Dr. MacNealy's opinion identifies poor memory, concentration deficits,

decreased energy, hostility and irritability, and suicidal ideation as among Strouse's symptoms,

these symptoms are not mentioned or otherwise documented in his any of his treatment notes.

Similarly, while Dr. MacNealy identifies panic attacks and generalized persistent anxiety as

symptoms of Strouse's mental impairments, neither his opinion nor his treatment notes diagnose

her with these conditions.

    Dr. MacNealy's opinion offers no explanation for these inconsistencies.  The Sixth

Circuit has found that inconsistencies between a treating physician opinion and his/her own

---

Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two
or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v.
Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016);  *Mireles ex rel. S.M.M. v.
Comm'r of Soc. Sec.*, 608 Fed. Appx. 397, 398 (6th Cir. 2015);  *Helm v. Comm'r of Soc.
Sec. Admin.*, 405 Fed. Appx. 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer,* 774
F.Supp.2d 875, 879 (N.D. Ohio 2011); *Pethers v. Comm'r of Soc. Sec.*, 580 F.Supp.2d
572, 579 n .16 (W.D. Mich.2008); *Carter v. Berryhill,* 2017 WL 2544064 at * 9 (N.D.
Ohio May 26, 2017); *Witnik v. Colvin,* 2015 WL 691329 at * 7 (N.D. Ohio Feb. 18,
2015).  Here, the record reflects Dr. Mac Nealy treated Strouse on only two occasions.
Thus, it is questionable whether he qualified as a "treating physician" at the time he
authored his July 2016 opinion.

treatment records is a proper basis for rejecting a treating physician opinion.  *See e.g., Hill v. Comm'r of Soc. Sec.*, 560 Fed. Appx. 547, 549-550 (6th Cir. March 2014) (finding ALJ properly rejected treating physician opinion where that physician's treatment notes "did not support his opinion" that the claimant had severe limitations and, in fact, "undermine[d]" his opinion); *Leeman v. Comm'r of Soc. Sec.*, 449 Fed. Appx. 496, 497 (6th Cir. Dec. 6, 2011) ("ALJs may discount treating physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."); *Payne v. Comm'r of Soc. Sec.*, 402 Fed. Appx. 109, 112–13 (6th Cir.2010).  *See also Oglesby v. Colvin*, 2014 WL 1156239 at * 10 (N.D. Ohio March 21, 2014) (finding "the ALJ has clearly articulated his reason for giving little weight to the opinion of Dr. Schmitt, that is, Dr. Schmitt's dire conclusions regarding Plaintiff's limitations are not supported by his own treatment notes.")  Here, the ALJ specifically pointed to Dr. MacNealy's treatment notes in rejecting his opinion, finding his largely normal mental status examination findings were inconsistent with his assessment of a wide array of severe mental functional limitations.

Strouse argues remand is nonetheless required because the ALJ failed to assess Dr. MacNealy's opinion in the context of the record as a whole.  In particular, she argues the ALJ should have accorded Dr. MacNealy's opinion greater weight because it was consistent with her multiple psychiatric hospitalizations, several of which were for extended periods of time.  The Court finds this argument to be without merit.  The ALJ acknowledged that Strouse was voluntarily admitted to the hospital on several occasions for extended treatment of her depression and anxiety.  (Tr. 15-16.)  Indeed, earlier in the decision, the ALJ discussed Strouse's October 2014, December 2014, February 2015 and January 2016 hospitalizations at length.  (*Id.*)  The

ALJ noted, however, that Strouse "improved with treatment and that once [her] concerns improved, she benefitted greatly from treatment." (Tr. 15.)  The ALJ repeated this finding at step four, noting Strouse "has sought treatment for increased depression with suicidal ideation, but her symptoms improved quickly with appropriate treatment and mental status evaluations from multiple sources note only mild to no more than moderate symptoms that are inconsistent with the marked degree of functional impairment she alleged." (Tr. 22.)

The ALJ's finding is supported by substantial evidence.  As discussed above, while Strouse was severely depressed on admission during her psychiatric hospitalizations, she stabilized and improved with medication and treatment.  (Tr. 548-549, 1197-1198, 716-718.)  Moreover, as the ALJ notes, several of Strouse's treatment providers noted mild to moderate symptoms during the relevant time period.  Dr. Conti's treatment notes, for example, consistently assessed GAF scores of 60, indicating moderate symptoms. (Tr. 713, 707, 706.)  Additionally, in September 2015, neurologist Dr. Yan found Strouse was alert and oriented with no impairment of recent or remote memory, normal attention span and ability to concentrate, and an appropriate fund of knowledge.  (Tr. 1223.)  Her mood and affect were described as "not anxious."  (Tr. 1224.)  Several months later, on November 24, 2015, Dr. Yan's neurologic examination findings were the same, including no impairment of recent or remote memory, normal attention span and ability to concentrate, and a "not anxious" mood and affect.  (Tr. 1218-1219.)  Additionally, treatment notes from Strouse's primary care provider, Amy Seese, D.O., from March and April 2016 noted Strouse was oriented to time, place, person and situation with an appropriate mood and affect.  (Tr. 765, 769, 773.)   Accordingly, Strouse's argument that the ALJ failed to assess Dr. MacNealy's opinion in the context of the record as a whole is without merit.

31

In light of the above, the Court finds the ALJ articulated "good reasons" for rejecting Dr. MacNealy's opinion and, further, that those reasons are supported by substantial evidence. While Strouse urges the Court to find that the reasons given by the ALJ do not constitute "good reasons," it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence. . . .")  Here, the ALJ provided good reasons for her rejection of Dr. MacNealy's July 2016 opinion and supported those reasons with reference to specific evidence in the record.  Strouse's argument to the contrary is without merit.

### Dr. Conti

Strouse next argues the ALJ erred in rejecting Dr. Conti's February 25, 2015 opinion. As discussed *supra*, in that opinion, Dr. Conti noted Strouse was alert and oriented with no hallucinations, an appropriate stream of thought, no suicidal ideation, average intelligence, and intact remote and recent memory.  (Tr. 704.)  She found Strouse had impaired concentration, "some impairment" in immediate retention and recall, "somewhat impaired" social judgment, and fair insight.  (*Id.*)  Dr. Conti indicated Strouse experienced "daily panic" and identified her triggers as social situations and chronic medical issues.  (Tr. 703.)  She concluded Strouse exhibited difficulties performing daily activities on a sustained basis, explaining "she often isolates and limits daily activities due to anxiety and poor health."  (*Id.*)  She also noted Strouse

32

had difficulties in social functioning, noting she "has a history of unhealthy relationships."  (*Id.*)

Dr. Conti found Strouse's physical and mental impairments negatively effected her ability to

maintain concentration, persistence, and pace.  (*Id.*)

Based on "client report and clinical observation," Dr. Conti concluded Strouse was

moderately[10] limited in her abilities to (1) understand, remember, and carry out simple

instructions; and (2) make judgments on both simple and complex work-related decisions.  (Tr.

701.)  She opined Strouse was markedly limited in her abilities to (1) understand, remember, and

carry out complex instructions; (2) interact appropriately with the public, supervisors, and co-

workers; and (3) respond appropriately to usual work situations and to changes in a routine work

setting.  (Tr. 701-702.)  When asked to identify the factors that supported her assessment, Dr.

Conti noted "client report."  (Tr. 702.)

The ALJ discounted Dr. Conti's opinion, explaining as follows:

> Dr Conti, who saw the claimant for counseling on three occasions in January and
> February of 2015, completed a mental source statement on February 25, 2015
> (Exhibit 7-F at 3-7).  Dr Conti indicated that the claimant would have moderate
> difficulty understanding, remembering, and carrying out simple instructions,
> making judgments on simple work-related decision[s], and making judgments on
> complex work-related decisions, and marked difficulty understanding,
> remembering, and carrying out complex instructions.  She reportedly based those
> conclusions [on] the claimant's report and her clinical observation.  She then
> indicated that the claimant would have marked difficulty interacting with the
> public, coworkers, and supervisors, and responding appropriately to usual work
> situations and to changes in a routine work setting, stating that she based those
> conclusions on the claimant's report.  Dr Conti also indicated that the claimant
> experienced no hallucinations or illusions, exhibited average intellect, and that her
> content of thought was without suicidal or homicidal ideation, but stated that she

---

[10] The form defines the term "moderate" as follows: "There is more than a slight
limitations in this area but the individual is still able to function satisfactorily."  (Tr. 701.)
The term "marked" is defined as follows: "There is serious limitation in this area.  There
is a substantial loss in the ability to effectively function." (*Id.*)

disassociated at times, isolated herself, and demonstrated impaired concentration and some impairment in immediate retention and recall, but was alert and oriented times three with intact remote and recent memory.

Dr Conti's records do not reflect the clinical findings she reported on her assessment and, in fact, are primarily remarkable only for the claimant's subjective complaints.  Dr Conti's initial assessment indicated only that the claimant reported some suicidal thoughts and no other findings.  On January 22, 2015, she reported a depressed and anxious mood, but appropriate affect and no suicidal or homicidal ideation with the only other remarkable information being the claimant's subjective report of multiple medical issues (which Dr Conti is not qualified to evaluate).  On February 5, 2015, the claimant focused on regrets over leaving her ex-boyfriend and medical issues.  She noted a depressed mood, but again reported appropriate affect with no suicidal or homicidal ideation.  There is no indication of the impaired concentration, dissociative symptoms, social withdrawal, daily panic, or impulsive behavior she reported in her assessment. Accordingly, the basis for Dr Conti's rather dire assessment is nothing more than the unquestioned acceptance of the claimant's subjective statements without clinical support.  In fact, Dr Conti indicated that the primary basis for her assessment was the claimant's report.  The findings set forth in her treatment notes are minimal and do not reflect the rather severe assessment, while she qualifies as a treating source (although her treatment was minimal and consisted of only three office visits), her opinion is not entitled to controlling, deferential, or even significant weight because it is not supported by the overall record, let alone her own mild clinical findings.

(Tr. 24-25.)

The Court finds the ALJ articulated "good reasons" for discounting Dr. Conti's opinion. The ALJ assigned Dr. Conti's "rather dire" assessment less than controlling weight because (1) it was inconsistent with her own treatment records; (2) not supported by the "overall record," and (3) based primarily on Strouse's subjective reports.  The Court finds the reasons provided by the ALJ are supported by substantial evidence.  As set forth above, Dr. Conti examined Strouse on January 12, 2015, January 22, 2015, and February 5, 2015.[11]  (Tr. 708-713, 707, 706.)  On the

---

[11] As with Dr. MacNealy, the Court questions whether Dr. Conti constituted a "treating physician" at the time she authored her February 2015 opinion, as she had only examined Strouse on three occasions over a two month period.  *See Kornecky*, 167 Fed. Appx. at 506–07 ("Depending on the circumstances and the nature of the alleged condition, two or

first of these visits, Dr. Conti diagnosed major depressive disorder, PTSD, generalized anxiety disorder, and history of bipolar disorder; but did not record any mental status examination findings or otherwise provide any discussion supporting her diagnoses.  (Tr. 708-713.)  On the second visit, Dr. Conti noted depressed and anxious mood with appropriate affect and no suicidal ideation. (Tr. 707.)  On the third (and last) visit, she found a depressed mood, appropriate affect, and no suicidal ideation.  (Tr. 706.)  During each of her treatment sessions with Strouse, Dr. Conti assessed a current GAF of 60 (indicating moderate symptoms) and highest GAF of 65 (indicating mild symptoms).  (Tr. 713, 707, 706.)  There are no findings in Dr. Conti's treatment notes that would support her February 2015 opinion that Strouse suffered from impaired concentration, persistence and/or pace, dissociation, impulsiveness, "daily panic," or difficulty performing daily activities or engaging in social functioning.

In light of the above, the Court finds the ALJ did not err in determining Dr. Conti's opinion of severe mental functional limitations was inconsistent with her own treatment notes. Dr. Conti's assessment that Strouse was limited in her abilities to understand, remember, and carry out simple instructions, for example, is simply not reflected in any of her treatment notes. None of her treatment notes mention or otherwise document deficits in concentration, persistence, pace or memory.  Moreover, Dr. Conti's consistent finding of GAF scores between 60 and 65 is not consistent with her opinion that Strouse is "markedly limited" in her abilities to interact appropriately with the public, supervisors, and co-workers, and respond appropriately to work situations and changes in a routine work setting.

_____

three visits often will not suffice for an ongoing treatment relationship"); *Kepke,* 636 Fed. Appx. at 629;  *Mireles*, 608 Fed. Appx. at 398.

Further, and as discussed in connection with Dr. MacNealy's opinion, the ALJ's conclusion that Dr. Conti's opinion is not supported by the "overall record" is supported by substantial evidence. The ALJ recognized Strouse's psychiatric hospitalizations but correctly noted that she stabilized and improved with medication and treatment. (Tr. 548-549, 1197-1198, 716-718.) Moreover, several of Strouse's treatment providers noted mild to moderate symptoms during the relevant time period. As noted supra, in September and November 2015, Dr. Yan found Strouse was alert and oriented with no impairment of recent or remote memory, normal attention span and ability to concentrate, an appropriate fund of knowledge, and a "not anxious" mood and affect. (Tr. 1223-1224, 1218-1219.) Finally, Dr. Seese's March and April 2016 treatment notes indicated Strouse was oriented to time, place, person and situation with an appropriate mood and affect. (Tr. 765, 769, 773.)

Finally, the ALJ did not err in discounting Dr. Conti's opinion, in part, on the ground that it based primarily on Strouse's subjective reports. When asked to identify the factors that supported her assessment of Strouse's mental limitations, Dr. Conti variously indicated "client report" and "client report and clinical observation." (Tr. 701, 702.) Thus, by her own admission, Dr. Conti relied heavily on Strouse's own reports in formulating her opinion of Strouse's mental functional limitations. Moreover, as Dr. Conti's treatment notes do not record "clinical observations" that are consistent with the severe limitations she assessed, substantial evidence supports the ALJ's conclusion that Dr. Conti's opinion was based primarily on Strouse's subjective statements.

The Court further finds the ALJ did not err in relying (in part) on this reason to discount Dr. Conti's opinion. The Sixth Circuit recently found that an ALJ properly discounts a treating

36

physician opinion that relies heavily on a claimant's self-reporting, even in the context of mental impairments. *See, e.g., Kepke*, 636 Fed. Appx. at 629 ("The ALJ also properly discounted Dr. Chapman's opinion because it relied heavily on Kepke's self-reporting, and "seemed to uncritically accept as true most, if not all, of what [Kepke] reported." * * * Regardless of any inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion."). *See also Francis v. Commissioner*, 414 Fed. Appx 802, 804 (6th Cir. 2011) (finding a physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all."); *McClellan v. Comm'r of Soc. Sec.*, 2017 WL 1173772 at * 3 (E. D. Mich. March 30, 2017) ("If Dr. Hasegawa merely adopted what McClellan reported, the opinion would not be entitled to significant weight.") Under the circumstances presented (i.e., the disparity between Dr. Conti's opinion of extreme limitations and her relatively benign treatment notes, including her consistent assessment of GAF scores between 60 and 65), the Court finds the ALJ did not err in relying on this reason (in part) to discount Dr. Conti's opinion. [12]

Accordingly, and for all the reasons set forth above, the Court finds the ALJ articulated "good reasons" for rejecting Dr. Conti's February 2015 opinion and, further, that those reasons are supported by substantial evidence.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

---

[12] Even if the ALJ did err in discounting Dr. Conti's opinion on this basis, remand is not required because the ALJ provided two additional, independent "good reasons" for rejecting Dr. Conti's February 2015 opinion; i.e., that it was inconsistent with her own treatment records, and not supported by the "overall record. "

final decision be AFFIRMED.

*s/Jonathan D. Greenberg*

Jonathan D. Greenberg
United States Magistrate Judge

Date: December 10, 2018

## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**